IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 27, 2022

## STATE OF TENNESSEE v. CHARLES HARDY, JR., ALIAS

**Appeal from the Criminal Court for Knox County**
No. 113809   Steven Wayne Sword, Judge

_____

**No. E2021-00616-CCA-R3-CD**

_____

The Defendant, Charles Hardy, Jr., alias, appeals his convictions for first degree premeditated murder and tampering with evidence, for which he received an effective sentence of life imprisonment. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions. Upon reviewing the parties' briefs, the record, and the applicable law, we affirm the trial court's judgments.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Forrest L. Wallace, Knoxville, Tennessee, for the appellant, Charles Hardy, Jr., alias.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Charme P. Allen, District Attorney General; and Sean McDermott and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Defendant was charged with first degree premeditated murder and tampering with evidence as a result of his beating and stabbing the victim, Mr. Kerry Dickinson, in May 2018 in Knoxville, Tennessee, resulting in the victim's death. A few days later, while the Defendant and his girlfriend, Ms. Kendra Ryan, were outside their apartment as

police officers were searching the apartment, the Defendant discarded a small knife used to cut the victim.

The victim was a veteran who struggled with alcoholism, received disability payments from the Navy, and was occasionally homeless. In 2013 or 2014, he sustained a severe head injury. His brother, Mr. Tim Gafnea, testified that as a result of the head injury, the victim became "just a little more uncontrollable." Mr. Gafnea explained that the victim became more "headstrong" and that as a result of the victim's reduced cognitive level and in combination with his alcohol consumption, "it was a little harder for him to maybe do what was right sometimes."

The victim's mother maintained control of the victim's money and would transfer money to his ATM card whenever he needed funds. On Sunday, May 20, 2018, the victim contacted his mother and requested money, and the victim's mother told him that she would contact the bank when it opened the next day. On Monday morning at 9:00 a.m., the victim's mother contacted the bank and transferred money to the victim's ATM card. When the victim had not used his ATM card by 3:00 or 4:00 p.m., family members began searching for the victim but were unable to locate him.

Ms. Kendra Ryan, who was charged with multiple offenses in connection with the victim's death, testified on behalf of the State at trial. She stated that the State had made no offers or promises to her in exchange for her testimony at trial.

Ms. Ryan testified that she and the Defendant lived in a small apartment on the third floor of an apartment complex on Cedar Lane in Knoxville. On Sunday, May 20, 2018, she and the Defendant each drank "a 24-ounce" container of alcohol. During the evening, she and the Defendant met the victim at a nearby gas station. The victim, who was intoxicated, told them that he had been stealing beer from various gas stations. Ms. Ryan stated that the victim did not have any injuries to his face. Ms. Ryan pulled the victim away from the roadway to prevent him from being struck by a car and invited the victim to accompany her and the Defendant to their apartment so that the victim could sober up and shower. They walked to the apartment, and Ms. Ryan stated that they did not encounter anyone along the way. She said the Defendant had to help the victim walk up the steps to ensure that the victim did not fall.

Ms. Ryan testified that once they arrived at the apartment around midnight or early Monday morning, the Defendant went to the bathroom, the victim sat on the couch, and she sat on her bed located near the couch. While the Defendant was in the bathroom, the victim did "something to his private part right in front of" Ms. Ryan. Ms. Ryan told the victim to leave, but he refused. The Defendant came out of the bathroom, asked Ms. Ryan what was wrong, and saw the victim with "his private out." The Defendant pulled

the victim off the couch and began hitting him. The victim fell and landed on his back on the floor between the couch and the bed. The Defendant continued to use his fists to hit the victim's face. Ms. Ryan stated that she tried to make the Defendant stop hitting the victim, but the Defendant refused to do so. The Defendant then produced a knife that was on his person and cut the victim "everywhere" as the victim was "[j]ust laying there." Ms. Ryan described the knife as blue with the outside of the knife shaped "like a lizard." She said the victim did not have a weapon, did not attack the Defendant, and did not try to hit him. She stated that the Defendant also struck the victim with a crutch that was in the apartment.

The Defendant told Ms. Ryan that he believed the victim was dead. Ms. Ryan testified that she knew the victim was still alive because he was breathing and moaning. He also moved around but was unable to get up off the floor, and he urinated on himself. She said the victim spoke, stating that he was "a Marine or something." Ms. Ryan covered the victim with a blanket, and he went to sleep. She testified that the Defendant threatened her with a knife if she reported him to police. She lay down and slept while the Defendant was still in the apartment.

The Defendant was at the apartment when Ms. Ryan awoke the next morning. She testified that the victim remained on the floor and had not moved during the night. She told the Defendant to instruct the victim to take a shower, but the Defendant said the victim was dead. Ms. Ryan believed the victim was still breathing. She went to the bank that afternoon. The victim was lying on the floor when she left, but she did not know whether the victim was still breathing. The Defendant was at the apartment when Ms. Ryan left and when she returned. Ms. Ryan testified that the victim was still lying on the floor when she returned to the apartment but that there was additional blood in the area. The Defendant did not say anything to Ms. Ryan.

Ms. Ryan testified that on Monday evening, she and the Defendant left the apartment and walked to a convenience store to purchase beer. She also visited her daughter and told her that the Defendant had beaten a man in their apartment and that the man was not moving. Ms. Ryan said that she did not have her cell phone with to call for help. The victim was still lying on the floor at the foot of her bed when she returned to her apartment.

On Tuesday, May 22nd, Ms. Ryan and the Defendant went to a nearby convenience store and purchased beer. Ms. Ryan testified that on Tuesday night, the Defendant went to a nearby tobacco store and asked his friend who worked at the store to borrow his car because he had killed someone. When the Defendant was unable to obtain a car, he dragged the victim's body to the bathroom. Ms. Ryan explained that the Defendant moved the victim's body because she felt bad for the victim and did not want

- 3 -

to see the victim's face. Before moving the victim, the Defendant placed a tarp over him because Ms. Ryan did not want to see the victim "like that" while in the bathroom. She stated that the Defendant cleaned blood in the apartment with "cleaning stuff."

On the afternoon of Wednesday, May 23rd, police officers came to the apartment, asking about the victim. Ms. Ryan consented to the officers' request to enter her apartment. She was taken to jail and spoke to detectives. She initially told the detectives that the victim was injured when he arrived at her apartment. She testified that she lied to the detectives. She initially testified that no one had instructed her to provide this initial story to the police, but she later testified that the Defendant had directed her to do so. She said she changed her story after the Defendant confessed.

On cross-examination, Ms. Ryan testified that she believed she was facing a sentence of approximately ten years for her charges and that she did not yet have an agreement with the State. She stated that she was supposed to tell the truth in her testimony.

Ms. Ryan testified that she and the Defendant first encountered the victim at 2:00 or 3:00 p.m. on Sunday, May 20th when they saw the victim walking next to the lines on the road while intoxicated. Ms. Ryan and the Defendant spent the day drinking malt liquor behind the tobacco store and began walking back to their apartment when it became dark. They saw the victim again at a convenience store. The victim was homeless and so intoxicated that he was unable to walk.

Ms. Ryan testified that she told the Defendant to stop beating the victim but that the Defendant refused. She said the Defendant had drank "a 211 and a Naughty Day," which he was not supposed to mix and that he was like "a different person." Once Ms. Ryan saw the Defendant with the knife, she turned away and told him to stop. She said that when the Defendant struck the victim with the crutch, "[b]lood went everywhere."

On redirect examination, Ms. Ryan testified that blood sprayed all over the walls when the Defendant struck the victim with the crutch. She saw additional blood in the apartment when she returned from the bank. She stated that the Defendant used bleach to clean the blood. After the victim had died, Ms. Ryan found two kitchen knives with blood on them under her bed. She placed the knives in her kitchen sink to clean the blood off of them. She stated that on the day of their arrest, the Defendant threw his knife on the ground near the apartment building.

Mr. David Siler lived in an apartment on the second level of the apartment complex where Ms. Ryan and the Defendant lived. Mr. Siler testified that on May 20, 2018, he spent the day sitting outside his apartment with two female neighbors and one of

their friends. At approximately 11:00 p.m., he saw Ms. Ryan, the Defendant, and the victim walking in the parking lot from the direction where a dumpster was located. The victim followed behind the Defendant and Ms. Ryan while walking up the stairs. When the victim reached Mr. Siler and his companions, the victim stopped and spoke to the women. Mr. Siler said the victim was smiling and weaving back and forth and that he appeared to be intoxicated. Mr. Siler did not observe any injuries on the victim's face or any "major stains" on his clothes. The victim then continued to the apartment which the Defendant and Ms. Ryan had already entered.

Mr. Siler and his companions remained outside until approximately 3:00 a.m. After Mr. Siler was inside his apartment for approximately twenty minutes, a neighbor came to his door and reported a fire inside her kitchen. After using a fire extinguisher to stop the fire, Mr. Siler remained outside with his neighbors to wait for the fire department to arrive. Mr. Siler testified that he saw Ms. Ryan exit her apartment twice, once to smoke a cigarette and once to check on the commotion caused by the fire. Mr. Siler never saw the Defendant or the victim step outside the apartment.

On Monday, May 21st, at around 7:00 a.m., Mr. Siler was sitting outside his apartment when he saw Ms. Ryan and the Defendant exit their apartment with the Defendant carrying two large black garbage bags. The Defendant approached the dumpster with the bags, and Mr. Siler later saw the Defendant walk away from the dumpster without the bags.

On Wednesday, May 23rd, Mr. Siler saw the apartment manager and the maintenance supervisor enter Ms. Ryan's apartment to repair a broken window. Mr. Siler saw the apartment manager make a telephone call while standing outside, and the police arrived a few minutes later. The police officers handcuffed Ms. Ryan and the Defendant and had them sit down on the ground below Mr. Siler's patio and near a rain gutter spout. Mr. Siler testified that as Ms. Ryan and the Defendant were sitting in the area, he "heard a commotion as if maybe metal or something heavy had clanged or hit." Later that night after Ms. Ryan and the Defendant had been taken away, Mr. Siler saw a police detective in the same area and an evidence marker on the ground next to a shiny object.

Mr. James Underwood, who worked at Merchants Tobacco on Cedar Lane in Knoxville in May 2018, testified that he became acquainted with the Defendant and often helped the Defendant by allowing him to perform odd jobs around the store whenever the Defendant needed money or by providing the Defendant with products and allowing him to pay for the products at a later time. Mr. Underwood stated that on May 21, 2018, the Defendant and Ms. Ryan entered the store, and the Defendant asked him to help move a body. The Defendant told Mr. Underwood that the man had acted "inappropriate[ly]," that the Defendant had asked the man to stop his behavior several times, and that the

Defendant "just snapped and d[id] what he d[id]." On the following day, the Defendant came to the store and told Mr. Underwood that he had moved the man's body into the bathroom and that the next time Mr. Underwood would see the Defendant would be on the news.

Mr. Jason O'Mary, the maintenance supervisor at the apartment complex where Ms. Ryan and the Defendant lived, testified that on Wednesday, May 23rd, he went to the apartment to replace a windowpane in the living room. He knocked on the door to let Ms. Ryan know that he would be repairing the window. Mr. O'Mary saw what he believed to be bed bugs when he removed the cover off the front window, and he said he could see blood on the wall that he believed was from people inside the apartment smashing the bugs on the wall. Mr. O'Mary reported his observations to the property manager and walked to the parking lot, and the police officers arrived shortly thereafter.

Officer John Pickens and Officer Tolliver Robertson with the Knoxville Police Department ("KPD") responded to the scene as a result of a call from a third party. They encountered the Defendant and Ms. Ryan, who had exited the apartment and walked down the steps toward the parking lot. Officer Pickens testified that he told Ms. Ryan that they received a call about a dead body inside the apartment. Ms. Ryan responded, "Yeah, there's actually one in there," and consented to the officers' request to enter the apartment. Officer Robertson remained with the Defendant and Ms. Ryan while Officer Pickens entered the apartment. Officer Pickens said that the apartment was small and that the bedroom and the kitchen were combined together at the front of the apartment. He located the victim's body underneath a blue tarp in the bathroom located in the back of the apartment. Officer Pickens exited the apartment and instructed Officer Robertson to handcuff the Defendant and Ms. Ryan until other officers arrived at the scene.

KPD Investigator Preston Whillock and Investigator Allen Cook also responded to the scene. Investigator Whillock testified that the Defendant and Ms. Ryan were in the parking lot with other officers when he arrived. He spoke to a patrol officer, who stated that Ms. Ryan had consented to the officers' entering the apartment, and another officer reaffirmed that consent with Ms. Ryan before Investigator Whillock entered the apartment. Investigator Whillock testified that when he entered the apartment, it was apparent to him that the apartment was not sanitary based upon the smell and the presence of bed bugs inside the apartment. He touched the carpet, which felt like a "wet sponge." He and Investigator Cook exited the apartment, put on protective suits, and reentered the apartment.

Investigator Whillock testified that the carpet was completely saturated with what appeared to be blood. He observed "drag marks" on the carpet leading into the bathroom where it appeared that "a blood-soaked body had been dr[agged]." He also observed

castoff blood spatter on the ceiling, walls, bed, sheets, and several items inside the apartment. He stated that the stains on the ceiling were smeared as if someone had attempted to clean the stains with bleach. Bottles of detergent were found inside the apartment, and officers later determined that the Defendant and Ms. Ryan had attempted to clean the blood. Furniture also appeared to have been moved in an attempt to conceal bloodstains on the carpet.

Investigator Whillock found the victim partially covered by a tarp in the bathroom. He testified that it was "obvious" that the victim was deceased as his body was discolored and in the early stages of decomposition and he had substantial injuries. The victim appeared to have been "thrown" or "piled" into the bathroom, and he appeared to have been "beaten black and blue." His eyes were so swollen and damaged that it appeared as if his eyes had been removed, and his face was disfigured. Investigator Whillock observed numerous lacerations or stab marks and a blunt force injury to the victim's head. He testified that an injury to the victim's forehead was consistent with the curvature of a lamp found in the apartment and that blood was on the curvature of the lamp. Officers located a crutch inside the apartment and knives, which had been cleaned, in the kitchen sink. Investigator Whillock testified that the victim had "unique bruises" on his abdomen that were "very sharp" in nature. Investigator Whillock stated that the Defendant later admitted that he had struck the victim numerous times with the sharp side of a fan blade that had fallen off the ceiling fan. The medical examiner's office took control of the victim's body.

Officers arrested the Defendant and Ms. Ryan and transported them to the jail. Due to "sanitary issues," the Defendant and Ms. Ryan were given showers and cleaned before they were taken to the Major Crimes office of the KPD for interviews. Investigator Whillock testified that he and Investigator Cook interviewed the Defendant, who was "very evasive." The Defendant waived his rights and agreed to speak with investigators without an attorney present. Initially, the Defendant maintained that the victim was injured when he arrived at the apartment, that the Defendant and Ms. Ryan invited the victim inside the apartment while unaware of the extent of his injuries, and that the victim died while inside the apartment. The Defendant stated that Ms. Ryan was in the process of being evicted from the apartment and that based upon prior conduct, he was prohibited from being on the property. He explained that he and Ms. Ryan did not report the victim's death because they were afraid they either would go to jail or be evicted from the property sooner than expected.

Investigator Whillock testified that other investigators were observing his interview of the Defendant from another room and were contacting officers to investigate the information provided by the Defendant. The officers were unable to locate any blood outside the apartment or any witness who saw the victim in the area with injuries prior to

his entering the apartment. Investigator Whillock stated that based on the nature of the victim's injuries, a large amount of blood would have been in the area outside of the apartment had the victim been injured before entering the apartment and that the victim would have been unable to walk anywhere without assistance.

Investigator Whillock testified that because the Defendant was being "evasive" and his story did not make sense, the investigators interviewed Ms. Ryan. Ms. Ryan also claimed that the victim was injured when he entered the apartment, and Investigator Whillock said it appeared that the Defendant and Ms. Ryan had rehearsed their story. Investigator Whillock stopped the interview because Ms. Ryan was "not coming off that lie." After officers obtained additional information during their investigation, the investigators returned to interview the Defendant.

Investigator Whillock testified that he and Investigator Cook confronted the Defendant, who denied that he lied but then agreed to tell the truth. Investigator Whillock stated that the Defendant told the investigators that he and Ms. Ryan had befriended the victim in the days prior to the discovery of the victim's body and invited the victim back to the apartment to drink alcohol. The Defendant said that while he was in the bathroom, the victim pulled down his pants and began "manually stimulating himself" while looking at Ms. Ryan. Ms. Ryan told the victim to stop and that the Defendant was jealous and would be upset. The Defendant stated that when he exited the bathroom and saw the victim, the Defendant became "enraged" and immediately began striking the victim using his fists. According to Investigator Whillock, the Defendant stated, "I whipped out my knife. There's—there's no one faster [with] a knife than I am. I whipped it out, and I went to stabbing him." The Defendant did not recall the number of times he stabbed the victim. He said he did not believe he stabbed the victim "that bad." The Defendant told Investigator Whillock that the victim fell to the ground and that the Defendant struck the victim with a blade from a ceiling fan. The Defendant maintained that he did not know he had killed the victim and said he and Ms. Ryan left the victim lying on the floor.

Investigator Whillock testified that the Defendant stated that he did not call the police upon realizing that the victim had died because the Defendant did not want to go to jail or be evicted from the apartment. Officers determined that the area where the victim lay the longest amount of time and lost the most blood was near the entryway of the apartment. The Defendant stated that he and Ms. Ryan continued their daily activities while the victim remained on the floor. Investigator Whillock stated that the Defendant and Ms. Ryan would have had to make "quite a bit of effort" to walk around the victim's body. The Defendant said the victim remained on the floor for one-half to one day before the Defendant "got tired of … walking over him." The Defendant said he dragged the victim's body to the bathroom and later placed a tarp over the victim. Investigator

Whillock testified that the Defendant explained that "it was difficult to try to focus on going to the restroom where there's a dead guy staring back at you."

The Defendant described the knife that he used as a small "key chain knife." Investigator Whillock stated that when officers first arrived at the apartment, they had the Defendant and Ms. Ryan sit down near a tree for a period of time. The Defendant told the investigators that while he was sitting near the tree, he took the knife out of his pocket and threw the knife in the grass. Another officer returned to the scene and found the knife. Investigator Whillock said the knife looked like "a little ornamental scorpion-type thing" and was not initially recognizable as a knife.

Investigator Whillock testified that at some point while interviewing the Defendant, the investigators moved the Defendant into a different interview room where the interview was recorded. The video recording of that portion of the interview was entered as an exhibit at trial and played for the jury. The recording reflected that during the interview, the Defendant initially denied that the victim sustained his injuries while inside the apartment. The Defendant later stated that he walked to a store and asked someone to help him move a body and that he discarded a knife when the police came to the apartment. After further questioning by the investigators, the Defendant stated that while he was in the bathroom, the victim began masturbating in front of Ms. Ryan. Ms. Ryan told the Defendant about the victim's behavior. The Defendant stated that the victim stood up and that the Defendant believed the victim was going to beat him. The Defendant said that he punched the victim but that the punch did not seem to affect the victim. The Defendant stated that he then punched the victim multiple times. The Defendant told the investigators, "I'm pretty quick with a blade" and that he began cutting the victim with a blue knife that looked like a "dragon" while the victim was still standing. The Defendant was unsure where he cut the victim. The Defendant stated that everything happened quickly and that he did not believe he struck the victim with any other objects. He maintained that he did not intend to injure the victim and that the victim did not die until approximately three days later.

Investigator Whillock testified that as he and Investigator Cook were interviewing the Defendant, two other investigators interviewed Ms. Ryan, who made a statement that mirrored the Defendant's statement about what had actually occurred. Investigator Whillock stated that his interview with the Defendant occurred prior to the victim's autopsy, and, therefore, he did not have access to the medical examiner's findings at the time of the interview.

On cross-examination, Investigator Whillock testified that the Defendant told him about striking the victim with the blade of a ceiling fan after the interview and while they were waiting for the Defendant to be transferred to jail. Investigator Whillock stated that

no evidence was analyzed for DNA, hairs, or fingerprints and explained on redirect examination that the analysis was unnecessary because there was no dispute as to who had been inside the apartment. He further explained that a DNA analysis of any material on the blade of the Defendant's knife would not have necessarily established that the knife was used on the victim because the victim's DNA could have been transferred onto the blade just based upon the amount of blood in the apartment and the amount of time the Defendant was inside the apartment following the attack.

KPD Sergeant Rodney Patton testified that on the night of May 23rd, following the discovery of the victim's body, an investigator informed him that the knife used on the victim was in the yard outside of the apartment. Sergeant Patton returned to the scene, where he located the knife, which appeared to have blood on it. Photographs of the location where the knife was found showed the knife lying in a grassy area near the side of a brick building. Sergeant Patton and a crime laboratory technician searched a nearby dumpster, where they located a bag containing a hat, a towel, a blanket, a pair of pants, and a washcloth, cleaning supplies, and a bottle of alcohol. The towel, blanket, pants, and washcloth had what appeared to be bloodstains on them.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson County and the chief pathologist for the Regional Forensic Center in Knoxville, performed the autopsy of the victim and was accepted by the trial court as an expert in forensic and anatomic pathology. Dr. Mileusnic-Polchan testified that the victim sustained fourteen sharp force injuries, thirty-six blunt force injuries, and a cluster of injuries on his abdomen that were a combination of sharp force and blunt force injuries. She concluded that the victim's primary cause of death were multiple sharp-force injuries and that multiple blunt-force injuries contributed to the victim's death. She also concluded that the manner of the victim's death was homicide.

Dr. Mileusnic-Polchan testified regarding fifteen blunt force injuries to the victim's face and head, some of which resulted in lacerations that tore the skin and some of the muscle under the skin. One of the blunt force injuries to the victim's forehead was a cluster of multiple lacerations that had a curved or curvilinear appearance. She stated that the curved injuries were consistent with the use of the curved base of a lamp to strike the victim. Some of the blunt force injuries impacted the victim's forehead and nose, which broke the base of his nose and resulted in "blowout" or "burst" fractures to the base of his skull. Dr. Mileusnic-Polchan explained that the impact to the forehead and the nasal bridge was so severe that it transferred the force, fractured the base of the skull, and also resulted in a focal injury on the brain. She stated that the victim could have lost consciousness and a large amount of blood as a result of the injury but that he would have survived the injury. The victim sustained bruises or abrasions to his shoulders, upper chest, torso, the back of his neck, and right upper and lower extremities. He also had

contusions and abrasions on his hands that were consistent with defensive wounds. Dr. Mileusnic-Polchan testified that although the victim's shirt was very bloody, his pants and shoes were "clean," which indicated that the victim was not standing when he sustained the various injuries.

Dr. Mileusnic-Polchan testified that the victim sustained a sharp force injury to the right side of his head that was consistent with a knife entering his ear, passing through the ear canal and inner ear, and ending at the mastoid process or bone. She identified two sharp force injuries on the right side of the victim's neck that were between one and one and one-quarter of an inch long. The victim also sustained two sharp force injuries on his right cheek, one sharp force injury on his left cheek, and a series of small, parallel cuts on the bottom of his nose, which indicated that a portion of the knife blade may have been serrated. Dr. Mileusnic-Polchan stated that the victim could have survived the sharp force injuries to his face even though the injuries would have caused a great deal of bleeding. The victim also sustained sharp force injuries to his left arm and forearm, as well as defensive sharp force injuries to his hands.

Dr. Mileusnic-Polchan testified that the victim sustained a sharp force injury to his back and that the thrust of the blade was so strong that it fractured one of his ribs, traveled through the muscle and between the ribs, entered his chest cavity, and punctured his lung. She stated that the blade of the knife was at least four inches long and that such an injury could have led the victim to die quickly after receiving it because his lung collapsed and he would have been unable to breathe. She said that while such an injury generally caused a substantial amount of internal blood loss due to the large number of blood vessels in the lung, the victim had very little blood in his lung. She explained that if all fourteen of the sharp force injuries occurred at the same time, she would have expected to see more blood in the victim's lungs. She stated that due to the lack of blood inside the victim's chest and around his injured lung, she believed that his circulation was already failing and he was bleeding from other injuries when he received the sharp force injury to his back.

Dr. Mileusnic-Polchan testified that the victim had a large amount of dried blood in the area of his head and neck from the lacerations on his forehead and that when those injuries occurred, his circulation was "effective" and "vigorous." She also noted a band of bruising on the victim's neck, which were the result of pressure being applied to the area. She viewed a sample of the muscle under a microscope and observed white blood cells coming into the tissue, which she explained meant that the victim remained alive for two to twenty-four hours after sustaining the injury. She agreed that her findings were consistent with victim's sustaining the wounds to his face and neck about twelve hours before he sustained the sharp force injury to his back. She explained that this conclusion was consistent with her findings that the victim remained alive for a period of time after

receiving the injuries to his neck muscles and explained why the wound to his back resulted in minimal hemorrhaging.

Dr. Mileusnic-Polchan testified that the victim had a series of linear superficial cuts and abrasions that were relatively thin and had a thin rim of bruising around them. She said the injuries were consistent with having been caused by a blade of a ceiling fan found at the scene. She stated that the victim did not live long enough after sustaining these injuries for the bruises to fully develop and that there was a yellow tinge around the area, indicating that the injuries occurred relatively close to his time of death. She also stated that based upon the condition of the victim's body, he had been dead at the scene for a period of days prior to the autopsy.

The Defendant chose not to offer any proof after the State rested its case. During closing arguments, the State informed the jury that it was relying upon evidence that the Defendant discarded his knife outside the apartment while officers were inside the apartment to support the charge of tampering with evidence. The jury convicted the Defendant of first degree premeditated murder and tampering with the evidence. The trial court sentenced the Defendant to concurrent sentences of life imprisonment for the first degree murder conviction and four years for the tampering with evidence conviction. The Defendant filed a motion for new trial, which the trial court denied following a hearing, and the Defendant appealed.

**ANALYSIS**

The Defendant asserts that the evidence is insufficient to support his convictions. When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to

support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. First Degree Premeditated Murder

The Defendant challenges the sufficiency of the evidence supporting his conviction for first degree premeditated murder, arguing that the evidence fails to establish the elements of intent and premeditation. He asserts that he was provoked by the victim and was not "thinking or acting rationally" when he attacked the victim. The State responds that the evidence is sufficient to support the conviction. We agree with the State.

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2018). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a) (2018). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id.* at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013). Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Repeated blows, although not alone sufficient to establish

- 13 -

premeditation, may be a relevant factor in determining the existence of premeditation. *Id.* Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 616. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

The evidence presented at trial established that the Defendant repeatedly hit and stabbed the intoxicated victim after the victim began masturbating in front of Ms. Ryan. The victim's injuries included fourteen sharp force injuries and thirty-six blunt force injuries. Once the Defendant punched the victim, the victim fell on the ground where he remained as the Defendant continued to beat him and stab him with a small knife that the Defendant kept on his person. The victim was unarmed and sustained multiple defensive wounds on his hands. Ms. Ryan testified that the Defendant struck the victim with a crutch, and the evidence established that at some point, the Defendant struck the victim on his head with the base of a lamp and on his abdomen with a blade from a ceiling fan. Ms. Ryan testified that the victim was still alive following the initial beating and stabbings. Rather than seek medical attention for the victim, the Defendant and Ms. Ryan left him on the floor of the apartment, went to bed, and then continued with their daily activities on the following day. Approximately twelve hours later, after Ms. Ryan left the apartment to run an errand and while the victim was still alive, the Defendant stabbed the victim in the back with a knife, puncturing the victim's lung. Ms. Ryan later found two kitchen knives with blood on them underneath her bed and placed them in the kitchen sink to clean them.

The Defendant attempted to clean the blood in the apartment and disposed of various articles of bloody clothing. He dragged the victim's body into the bathroom and covered his body with a tarp, and he sought assistance in disposing the victim's body. When police officers were inside the apartment investigating the victim's death, the Defendant removed the knife used to stab the victim during the initial attack and dropped it in a grassy area outside the apartment building in an effort to dispose of it. Officers were able to locate the knife only after the Defendant gave a statement, acknowledging that he stabbed the victim and informing the officers of the knife's location. We conclude that this evidence, when viewed in the light most favorable to the State, is sufficient to establish both the elements of intent and premeditation. Accordingly, the Defendant is not entitled to relief on this issue.

## B. Tampering with Evidence

Tennessee Code Annotated section 39-16-503(a)(1) defines the offense of tampering with evidence as follows:

(a)  It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to:

(1)  Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding….

The indictment alleged that the Defendant unlawfully and knowingly "conceal[ed] things with the intent to impair the availability of said things as evidence in an investigation" and "knowing that an investigation was pending and in progress."  The Defendant argues in his brief that the record is unclear what "things" upon which the State relied as the basis for the tampering charge.  He identifies the "things" upon which the State might have relied as the victim's body, the bloody clothes recovered from the dumpster, the blood inside the apartment, and the knife found in the grassy area outside the apartment, and he maintains that regardless, the evidence is insufficient to support the conviction.  In its brief, the State relies upon the Defendant's actions with respect to each of these items of evidence in maintaining that the proof is sufficient to support the conviction.  During closing arguments in the present case, the prosecutor informed the jury that the State was relying upon the knife found in a grassy area near the apartment building as the "thing" with which the Defendant tampered to support the charge of tampering with evidence.  Accordingly, we analyze sufficiency of the evidence in light of the State's theory of the case.

To sustain a conviction for tampering with evidence, the State was required to prove three elements beyond a reasonable doubt: "'timing, action, and intent.'"  *State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013)  (quoting *State v. Gonzales*, 2 P.3d 954, 957 (Utah Ct. App. 2000)).  "The 'timing' element requires that the act be done only after the defendant forms a belief that an investigation or proceeding 'is pending or in progress.'"  *Id.* (quoting T.C.A. § 39-16-503(a)); *see State v. Smith*, 436 S.W.3d 751, 763 (Tenn. 2014).  The word "pending" in section 39-16-503(a) means "impending" or "about to take place."  *Smith*, 436 S.W.3d at 763 (citations omitted).  The Defendant does not challenge the "timing" element with respect to the knife.  The evidence established that the Defendant removed the knife from his person and placed it on the ground as he and Ms. Ryan were sitting outside in the company of Officer Robertson, while other officers were inside the apartment investigating the victim's death.  Thus, the evidence

established that at the time he removed the knife from his person, he had formed a belief that an investigation was in progress.

The Defendant challenges the "action" and "intent" elements. "The 'action' element requires alteration, destruction, or concealment.'" *Hawkins*, 406 S.W.3d at 132. In the present case, the State relied upon the Defendant's concealment of the knife. To "conceal" an item means "to prevent disclosure or recognition of" the item or "to place [the item] out of sight." *Id.* (citing *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)). To establish the "intent" element, the State must show that the defendant intended for his actions "to hinder the investigation or official proceeding by impairing the record's document's, or thing's 'verity, legibility, or availability as evidence.'" *Id.* (quoting T.C.A. § 39-16-503(a)(1)). Tampering with evidence is a "specific intent" crime. *Id.* (citations omitted).

The Defendant relies upon the Tennessee Supreme Court's opinion in *State v. Hawkins*, in which the court held that the evidence was insufficient to establish that the defendant tampered with physical evidence by discarding a gun that he had used to shoot the victim. *Id.* at 125. The court, in analyzing the issue, described the facts as "unique" and summarized the evidence as follows:

> In the heat of the moment, shortly after firing the fatal shot, [the defendant] tossed his shotgun over a fence. He did not immediately leave the crime scene. The fence was short and easy to see through. Nothing actually covered the weapon. Had the area been well-lit, the gun would have been easily seen, especially against the snow that lightly covered the ground. The police appear to have found the shotgun rather quickly, and the shotgun itself as well as the DNA evidence found on the shotgun were successful produced as evidence against [the defendant] at trial.

*Id.* at 137. The court stated that the defendant did not place the shotgun "out of sight," that any prevention of disclosure or recognition of the shotgun was only for a brief prior of time, that the defendant placed the shotgun where it was likely to be discovered, and that the defendant only attempted to conceal the fact of his possession of the shotgun and not the shotgun itself. *Id.* (citations omitted). The court concluded that the State failed to establish beyond a reasonable doubt that the defendant "'prevented[ed] disclosure or recognition of' the shotgun or placed it 'out of sight.'" *Id.* at 138 (quoting *Majors*, 318 S.W.3d at 859). Thus, the court held that when the defendant "tossed the murder weapon into a location adjacent to the crime scene, where it lay in plain view and was easily found, [the defendant] did not conceal the weapon within the meaning of" section 39-16-503(a)(1). *Id.*

Unlike the defendant in *Hawkins*, the Defendant in the present case did not toss the knife "[i]n the heat of the moment" shortly after killing the victim. *See id.* at 137. Rather, during the days after killing the victim, the Defendant attempted to clean the crime scene, discarded bloody clothing, and sought assistance to remove the victim's body from the apartment. Once the police arrived and while the Defendant and Ms. Ryan were sitting outside the apartment building, the Defendant removed the knife from his person and dropped it into the grass. Unlike the shotgun in *Hawkins*, which was easily seen in the location where it was thrown and was easily recognizable as a weapon, the knife was so small that the Defendant described it as like a "key chain," and it was shaped like a scorpion, lizard or dragon. *See id.* Investigator Whillock testified that the knife as not recognizable as a knife because it looked like "a little ornamental scorpion-type thing." Officers did not locate the knife until later that night after the Defendant described the knife to them and informed them of the location where he threw it. We conclude that this evidence, when viewed in the light most favorable to the State, was sufficient to establish that the Defendant concealed the knife.

The Defendant appears to argue that the "intent" element was not established because his actions did not impair the knife's availability as evidence. As this court recently has noted:

> "A person acts with the intention to impair the availability of the evidence in a subsequent investigation or proceeding related to the offense when it is the person's conscious objective or desire to impair the availability of the evidence. The focus of this element is only whether [the person] intended to impair the availability of the thing by concealing it; it is not an element of the offense that concealment actually impair the evidence's availability."

*State v. Deandre Marrece Ellis*, No. M2020-01451-CCA-R3-CD, 2021 WL 6065321, at *7-8 (Tenn. Crim. App. Dec. 22, 2021), *perm. app. filed* (Tenn. Mar. 7, 2022) (quoting *Juan Ramon Barron v. State*, No. 11-19-00128-CR, 2021 WL 1432978, at *2 (Tex. Ct. App. Apr. 15, 2021)). Although the Defendant's actions did not result in the actual impairment of the knife's availability as evidence, we conclude that the evidence is sufficient to establish that the Defendant intended to do so when, after making numerous efforts to conceal or destroy other evidence of his crimes, he secretly removed the small knife from his person and tossed it into the grass outside the view of police officers. We, therefore, hold that the evidence is sufficient to support the Defendant's conviction for tampering with evidence.

**CONCLUSION**

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE